**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
03/23/2007
Log Number 512068934

**TO:**   Sandra L. Phillips, Chief Litigation Counsel
          Pfizer Inc.
          235 East 42nd Street, Mail Stop 150/02/14
          New York, NY, 10017-5755

**RE:**   **Process Served in Kentucky**

**FOR:**  Pfizer Inc. (Domestic State: DE)

---

**DAILY INTAKE**

MAR 2 6 2007

**Pfizer Litigation Group**

---

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Tammy Shea Brady, Individually and as Personal Representative of the Estate of Charles Brady, et al., Pltfs. vs. Pfizer, Inc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Attachments |
| **COURT/AGENCY:** | Jefferson County Circuit Court of Kentucky, KY Case # 07-CI-2826 |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - Charles Brady's use of Bextra was a sustantial factor in causing an acute myocardial infarction and subsequent treatment, injury and death - on 3/25/2005 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Louisville, KY |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 03/23/2007 postmarked on 03/22/2007 |
| **APPEARANCE OR ANSWER DUE:** | within 20 days |
| **ATTORNEY(S) / SENDER(S):** | Jeffrey K. Branstetter Blanton & Branstetter, LLC 705 Meigs Avenue Jeffersonville, IN, 47130 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex 2 Day, 798635629954 |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 1511 Kentucky Home Life Building Louisville, KY, 40202 |
| **TELEPHONE:** | 502-587-5960 |

Page 1 of 1 / MR

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of the package only, not of its contents.

**EXHIBIT**

A

**07 CI 002826**

| | | |
|---|---|---|
| AOC-105          Doc. Code: CI<br>Rev. 1-07     03/19/2007 10:58 am<br>Page 1 of 1        Ver. 1.02<br>Commonwealth of Kentucky<br>Court of Justice   www.courts.ky.gov<br>CR 4.02; CR Official Form 1 | **CIVIL SUMMONS** | Case No. _____<br>Court   [X] Circuit [ ] District<br>County   _Jefferson_ |

**PLAINTIFF**

Tammy Shea Brady, Individually and as Personal Representative
of the Estate of Charles Brady, et al.

~~ON CIRCUIT COURT~~
~~ON ELEVEN (11)~~

VS.

**DEFENDANT**

Pfizer, Inc.
235 East 42nd Street
New York, NY 10017-5755

**Service of Process Agent for Defendant:**

C.T. Corp. System
Kentucky Home Life Building, Suite 1102
239 S. Fifth Street
Louisville, KY 40202

**THE COMMONWEALTH OF KENTUCKY**
**TO THE ABOVE-NAMED DEFENDANT(S):**

You are hereby notified a legal action has been filed against you in this Court demanding relief as shown on
the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on
your behalf within 20 days** following the day this paper is delivered to you, judgment by default may be taken against you
for the relief demanded in the attached Complaint.

The name(s) and address(es) of the party or parties demanding relief against you are shown on the document
delivered to you with this Summons.

Date: **MAR 21 2007** , 2 _____          David L. Nicholson          Clerk

By: _____ D.C.

**Proof of Service**

This Summons was served by delivering a true copy and the Complaint (or other initiating document) to:

_____

this _____ day of _____, 2_____.

Served by: _____

_____ Title

CASE NO. _____

## 07 CI 002826

TAMMY SHEA BRADY, Individually and
as Personal Representative
of the Estate of CHARLES BRADY

**And**

TAMMY SHEA BRADY, as Guardian of
                    , a Minor

**And**

TAMMY SHEA BRADY, as Guardian of
                    , a Minor

**And**

TAMMY SHEA BRADY, as Guardian of
                    , a Minor

**vs.**

PFIZER, INC.
235 East 42nd Street
New York, NY 10017-5755

    SERVE:   C.T. Corp. System
                Ky. Home Life Bldg., Room 1102
                Louisville, KY 40202

**And**

JOHN DOE ONE

**And**

JOHN DOE TWO

**And**

JEFFERSON CIRCUIT COURT
DIVISION _____
JUDGE _____

JEFFERSON CIRCUIT COURT
DIVISION ELEVEN (11)

PLAINTIFFS

COMPLAINT

REDACTED

ROBERT S. TILLETT, JR., M.D.
250 LIBERTY STREET, SUITE 202
LOUISVILLE, KY 40202

And

LOUISVILLE NEUROLOGY ASSOCIATES, PSC

    SERVE:   Roy J. Meckler, M.D.
               202 Doctor's Office Building
               205 E. Liberty Street               **DEFENDANTS**
               Louisville, Kentucky 40202

        Come now Tammy Shea Brady, Individually and as Personal Representative of the Estate of Charles Brady, Tammy Shea Brady, as Guardian for         , a Minor, Tammy Shea Brady, as Guardian for :       /, a Minor and Tammy Shea Brady, as Guardian for       ', a Minor, by counsel, and for their Complaint and cause of action against Defendants state as follows:

## PARTIES, JURISDICTION AND VENUE

1.    Charles Brady was at all times applicable hereto a resident of Louisville, Jefferson County, Kentucky. At all times relevant to this Complaint, Charles Brady lived with his spouse, Plaintiff, Tammy Shea Brady. Beginning on or about May 15, 2002, and continuing through approximately March 23, 2005, Charles Brady took the prescription drug Bextra® manufactured, marketed and sold by Pfizer and Co., Inc., and prescribed by Robert S. Tillett, Jr., M.D. On or about March 16, 2005, Charles Brady suffered an acute myocardial infarction and died on March 25, 2005. Charles Brady's use of Bextra® was a substantial factor in causing the acute myocardial infarction and subsequent treatment, injury and death of Charles Brady.

2

**REDACTED**

2.   Tammy Shea Brady brings this action both Individually and as Personal Representative of the Estate of Charles Brady. Tammy Shea Brady is and was at all times applicable hereto a resident of Louisville, Jefferson County, Kentucky.

3.   Tammy Shea Brady is the duly appointed Personal Representative of the Estate of Charles Brady, deceased. A copy of the Certificate of Qualification is attached hereto.

4.   Plaintiff, Tammy Shea Brady, is the duly appointed Guardian of              , a Minor. A copy of the Order Appointing Guardian is attached hereto.

5.   Plaintiff, Tammy Shea Brady, is the duly appointed Guardian of              , a Minor. A copy of the Order Appointing Guardian is attached hereto.

6.   Plaintiff, Tammy Shea Brady, is the duly appointed Guardian of              , a Minor. A copy of the Order Appointing Guardian is attached hereto.

7.   Tammy Shea Brady, both Individually and as Personal Representative of the Estate of Charles Brady, Tammy Shea Brady, as Guardian of              , a Minor, Tammy Shea Brady, as Guardian of              , a Minor, and Tammy Shea Brady, as Guardian of              , a Minor, are hereafter collectively referred to as Plaintiffs.

8.   The Defendant, Pfizer, Inc. (hereafter referred to as "Pfizer"), is a Delaware corporation with its principal place of business in New York. At all times material hereto, Pfizer was engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting, and/or selling, either directly or indirectly, through third parties or related entities, anti-inflammatory and other drugs, including Bextra®.

9.   The Defendants, John Doe One and John Doe Two, are fictitious parties representing drug sales representatives, supervisors or "detail persons" who, on behalf of Pfizer,

3



marketed and promoted Bextra® in the Commonwealth of Kentucky to the health care provider(s) treating Charles Brady, and prescribing or otherwise supplying Bextra® to Charles Brady. On information and belief, at all times material hereto, John Doe One and John Doe Two were residents of the Commonwealth of Kentucky.

10.     The Defendant, Robert S. Tillett, Jr., M.D. (hereafter referred to as "Dr. Tillett"), is and was at all times relevant hereto a resident of Louisville, Jefferson County, Kentucky with professional offices located at 250 Liberty Street, Suite 202, Louisville, Kentucky 40202. Dr. Tillett was at all times relevant hereto a physician duly licensed to practice medicine in the Commonwealth of Kentucky. Dr. Tillett's address for service of process is 250 Liberty Street, Louisville, Kentucky 40202. At all times relevant hereto, Dr. Tillett was an employee or agent of Louisville Neurology Associates, PSC (hereafter referred to as "LNA, PSC") and was acting within the scope and course of that employment or agency.

11.     LNA, PSC is a Kentucky corporation with its principal place of business in Louisville, Jefferson County, Kentucky, and has an office and employees in Louisville, Jefferson County, Kentucky, where Dr. Tillett works. Its agent for service of process is Roy J. Meckler, M.D., 202 Doctor's Office Building, 250 E. Liberty Street, Louisville, Kentucky 40202.

12.     The Defendant, Pfizer, at all times relevant hereto, was a foreign corporation, duly licensed and authorized to do business in the Commonwealth of Kentucky and has designated CT Corp. System, Ky. Home Life Bldg., Room 1102, Louisville, KY 40202 as its registered agent for service of process. Said Defendant is subject to the jurisdiction of this Court pursuant to KRS 454.210, and other applicable law.

4

13.   The damages claimed herein are in excess of the minimum jurisdictional requirements of this Court.

14.   Venue is proper pursuant to KRS 452.450 and 452.460.

## FACTUAL BACKGROUND

### Properties of COX Inhibitors

15.   Bextra® (Rofecoxib) is a prescription drug designed and used to treat pain and inflammation. As discussed below, Bextra® is a COX-2 selective non-steroidal anti-inflammatory agent ("NSAID").

16.   NSAIDs were developed in the 1960s and 1970s, and prescribed to provide relief of pain and inflammation. They were widely used by the 1990s, especially by older people suffering from osteoarthritis and rheumatoid arthritis. Epidemiological studies in the 1980s demonstrated that long term use of NSAIDs increased the risk of gastrointestinal ("GI") problems by 4-6 times, with the risk being more pronounced in the elderly. As a result, researchers and pharmaceutical companies began seeking alternative treatments with fewer gastrointestinal side effects.

17.   NSAIDs work by inhibiting the action of the cyclooxygenase (COX) enzyme which is involved in the production of prostaglandins, thereby reducing inflammation and the associated pain. Research into the causes of gastrointestinal toxicity showed that prostaglandins also play a role in protecting the stomach lining from the effects of gastric acid.

18.   In 1989, it was postulated that there were two forms of the COX enzyme: COX-1 and COX-2. It was believed that COX-2 played a role in the release of prostaglandin from inflammatory sites, while COX-1 helped maintain the integrity of the GI tract. Typical

5

NSAIDs inhibit both forms of the COX enzyme. It was theorized that a drug which inhibited only COX-2 would reduce inflammation without adverse GI effects. This class of drugs is known as the coxibs.

19.    COX-2 is involved in more than the inflammatory process. It plays a role in normal renal function, reproductive biology and neurological functioning. COX-2 also plays a role in maintaining normal functioning of the vascular endothelium and in the production of prostacyclin ("$PGI_2$").

20.    COX-2 is associated with the production of $PGI_2$ by the vascular endothelium. $PGI_2$ inhibits platelet aggregation (clotting) and is a vasodilator. In contrast, COX-1 is associated with the production of thromboxane $A_2$ ("$TXA_2$") by platelets. $TXA_2$ is a potent platelet aggregator and vasoconstrictor. Under normal circumstances $PGI_2$ and $TXA_2$ have offsetting effects resulting in a homeostatic balance within the body.

21.    NSAIDs are non-selective COX inhibitors that inhibit both COX-1 and COX-2, thereby inhibiting production of both $PGI_2$ and $TXA_2$, and maintaining a rough balance between the two. Selectively inhibiting COX-2 upsets the natural balance between $PGI_2$ and $TXA_2$ by inhibiting primarily $PGI_2$, thereby giving free rein to $TXA_2$'s clotting and vasoconstriction properties.

22.    COX-2 also helps maintain the normal functioning of the vascular endothelium where not only $PGI_2$ but other anti-coagulants such as nitric oxide, thrombomodulin, heparin sulfates and t-PA are produced. COX-2 inhibition therefore blocks redundancies in the vascular system by suppressing production of these other anti-coagulants by the vascular endothelium.

6

23.  This impact on endothelial function is especially important given that many likely users
     of COX-2 inhibitors will have pre-existing or pre-disposing factors for cardiovascular
     risks, including some degree of atherosclerotic plaque which damages the vascular
     endothelium. A damaged vascular endothelium causes an imbalanced pro-thrombotic
     state because the damaged endothelium contributes to narrowed arteries and also
     produces less $PGI_2$ and other anti-coagulants which would otherwise inhibit platelet
     aggregation.

24.  Many users of COX-2 inhibitors are at a heightened risk and even more susceptible to the
     pro-thrombotic effects of selective COX-2 inhibition.

25.  With selective COX-2 inhibition, there is no corresponding suppression of the platelet
     aggregation and vasoconstriction effects of $TXA_2$.

### The Bextra® Timeline

26.  On or about January 15, 2001, G.D. Searle LLC, a subsidiary of Pharmacia Corp.
     ("Searle") submitted a New Drug Application ("NDA") for Bextra®. The FDA granted
     approval on November 16, 2001. Thereafter, Bextra® was jointly marketed by
     Searle/Pharmacia and Pfizer. On or about March 2001, Searle was acquired by Pharmacia
     Corp. a/k/a Pharmacia & Upjohn, Inc. ("Pharmacia"). On or about July 2002, Pfizer and
     Pharmacia signed an agreement for the acquisition of Pharmacia by Pfizer. The
     Acquisition was completed on or about April 2003. As used herein, "Pfizer" includes
     each of these entities as the date and context may appear.

27.  Following FDA approval, Pfizer launched an aggressive advertising and public relations
     campaign to promote Bextra®.

7

28.   Pfizer never conducted any testing of Bextra® where cardiovascular and thromboembolic events were the primary endpoints.

29.   Before submittal of the Bextra® NDA, Pfizer knew that selective COX-2 inhibition could be pro-thrombotic and dangerous to the potential users of Bextra®. Pfizer actively contrived to conceal and minimize this fact for fear that it would hurt sales of the drug.

30.   Before submittal of the Bextra® NDA, Pfizer declined to study the cardiovascular effects of COX-2 inhibition in the patients expected to use Bextra®, even though Pfizer was aware that many users of Bextra® would already be at risk of serious adverse cardiovascular events. Pfizer never advised health care providers or patients of its failure to conduct such studies.

31.   Before approval of the Bextra® NDA, Pfizer was aware that other researchers had also confirmed in both human and animal studies the likelihood of serious cardiovascular risk with the use of COX-2 inhibitors and that further trials were necessary to determine whether a COX-2 inhibitor would be both efficacious and safe in its intended population.

32.   The FDA safety review of the NDA for Bextra® noted Pfizer's inability to provide an answer to the actual risk of adverse cardiovascular and thromboembolic events for patients on Bextra®.

33.   Pfizer has never conducted any testing meant to determine the risk of cardiovascular and thromboembolic events in the intended patient population of Bextra® users.

34.   On or about January 1, 1999, Merck & Co., Inc. ("Merck") began the Vioxx Gastrointestinal Outcomes Research ("VIGOR") trial to substantiate a gastrointestinal safety claim for its COX-2 drug, Vioxx®.

35.    On or about November 18, 1999, the VIGOR Data Safety Monitoring Board expressed concern about the "excess deaths and cardiovascular events" in the group of study participants taking Vioxx®.

36.    On or about March 2000, Merck revealed the initial VIGOR results showing that patients using Vioxx® had double the rate of serious cardiovascular events than those on the comparator drug, Naproxen (a non-selective NSAID). The data also showed a four-fold increase in heart attack risk. When the complete data was reanalyzed, the actual increase in relative risk of a heart attack was 5.04, compared to a relative risk of 1.0 in the participants taking Naproxen rather than Vioxx®. The relative risk of a serious cardiovascular event, which included heart attacks, strokes, sudden death and unstable angina, was 2.3.

37.    During this time, Pfizer continued to be aware of the adverse cardiovascular effects associated with the use of Bextra®. Pfizer also became aware of studies indicating that the COX-2 enzyme selectively suppressed by Bextra® is cardio-protective.

38.    Once again, Pfizer decided not to conduct a study designed to determine the extent of cardiovascular risks associated with Bextra®.

39.    Instead, Pfizer continued to dispute these and other studies indicating increased cardiovascular risks associated with Bextra® and the cardio-protective effects of the COX-2 enzyme.

40.    On or about November 2000, the VIGOR results were published in the New England Journal of Medicine.

41.    On or about August 29, 2001, the Journal of the American Medical Association published a peer reviewed study by the Cleveland Clinic Foundation which conducted a meta-

9

analysis of several clinical trials, including the VIGOR trial. The authors concluded that the VIGOR results showed a 2.2 times greater risk of a serious cardiovascular event in those taking Vioxx® as compared to Naproxen. The relative risk between Vioxx® and Naproxen among aspirin-indicated patients (i.e., those already at some cardiac risk) was 4.89. The authors theorized that COX-2 inhibitors "by decreasing $PGI_2$ production may tip the natural balance between prothrombotic thromboxane $A_2$ and antithrombotic $PGI_2$, potentially leading to an increase in thrombotic cardiovascular events." The authors concluded with the observation: "Given the remarkable exposure and popularity of this new class of medications, we believe that it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of these agents." Mukherjee, D., et al., *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, J. Amer. Med. Assn. 286:8, 954, 957, August 22/29, 2001.

42.    Two of the Cleveland Clinic study authors, Drs. Topol and Nissen, claim they were lobbied by the manufacturers, Merck and Pfizer, to temper their criticisms prior to publication, and further stated that they had tried unsuccessfully to get the manufacturers to launch new clinical studies of the possible cardiac risks.

43.    By 2003 Pfizer still had not conducted a study specifically designed to assess cardiac and thrombotic risks associated with Bextra®. The need for such a study was especially great given inherent limitations in the FDA's Adverse Event Reporting System. That system is useful for identifying unusual events, but practically worthless for common events such as heart attack and stroke.

44.    Independent researchers continued to conclude that the use of Bextra® and other COX-2 inhibitors lead to increased vascular and thrombotic events and that their poor safety

performance could not be excused by the attempted explanations of Pfizer and other manufacturers.

45.    Both independent researchers and studies funded by COX-2 manufacturers continued to show the increased cardiovascular risk of COX-2 inhibitors, including Bextra®. Pfizer nevertheless continued to ignore adverse findings and attempted to obstruct and minimize the import of these studies.

46.    On or about September 30, 2004, Merck publicly announced that it was pulling its COX-2 inhibitor, Vioxx®, from the market because data from a clinical trial indicated a tripled risk of heart attack.

47.    On or about January 10, 2005, the FDA sent a nine page letter to Pfizer, warning that Pfizer's promotion of Bextra® was false and misleading and demanding corrective action.

48.    On or about April 7, 2005, and following the convening of a COX-2 Advisory Committee, the FDA asked Pfizer to voluntarily withdraw Bextra®. Pfizer initially agreed only to suspend sales and marketing in the United States. The FDA based its position on a determination that serious adverse cardiovascular events appeared to be a COX-2 class effect, the absence of any long term cardiovascular safety data on Bextra®, and the absence of any unique advantages over other NSAIDs, concluding that "the overall risk versus benefit profile for Bextra is unfavorable."

49.    On or about January 19, 2005, the Journal of the American Medical Association published an editorial by Eric Topol, discussing the need, as early as 2000, for clinical trials assessing the cardiovascular safety of Vioxx®, Celebrex® and Bextra®. Topol, E.,

11

*Arthritis Medicines and Cardiovascular Events—"House of Coxibs"*, <u>Journal of the</u> <u>American Medical Association</u>, Vol. 293, No. 3 January 19, 2005.

50.    Despite a known risk potential, repeated calls for study and results from the VIGOR and other trials, Pfizer recklessly and willfully failed to conduct adequate studies to establish the safety of Bextra®.

51.    Pfizer never disclosed on its warning labels that such testing had not been performed, thereby fraudulently inducing health care providers and patients alike to use Bextra® under the false assumption that it had been sufficiently tested.

<u>**Fraudulent Concealment, Tolling and Estoppel**</u>

52.    Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial by Pfizer of the facts as alleged herein.

53.    Plaintiffs have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

54.    Plaintiffs could not reasonably have discovered the dangerous nature of and unreasonable adverse side effects associated with Bextra® before the publicity surrounding the drug's withdrawal from the market.

55.    Pfizer should be estopped from relying on any statute of limitations defense because Pfizer is and was under a continuing duty to disclose the true character, quality, and nature of Bextra® to Plaintiffs and it failed to do so.

56.    Plaintiffs did not have any factual basis to be aware of the claims asserted herein until September 30, 2004, or later.

57.    Pfizer should be estopped from asserting the affirmative defense that any of Charles Brady's health care providers were learned intermediaries since Pfizer actively

12

misrepresented and concealed vital safety information regarding the cardiovascular risks

of Bextra®.

### CAUSES OF ACTION

**COUNT I – STRICT LIABILITY**
**(Against Pfizer)**
**Restatement of Torts (Second) §402A**
**or**
**Restatement of Torts (Third): Prod. Liab. §6**

58.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set

forth herein at length.

59.    Bextra® as sold by Pfizer was defective and unreasonably dangerous to consumers,

including Charles Brady.

60.    Bextra® was expected to reach, and did reach, prescribing physicians and consumers

throughout the United States, including Charles Brady, without substantial change in the

condition in which it was originally sold by Pfizer.

61.    Bextra® was defective and unreasonably dangerous at the time it was placed in the

stream of commerce in ways which include, but are not limited to, one or more of the

following particulars:

a.    Bextra® had unreasonably dangerous design defects and was not reasonably safe
as intended to be used, subjecting Charles Brady to risks which exceeded any
benefits of the drug;

b.    Bextra® was defective in design and formulation, because making use of the drug
was more dangerous than an ordinary consumer would expect and Pfizer failed to
adequately warn of the risks associated with the use of said drug;

c.    Pfizer failed to conduct adequate pre- and post-clinical testing and research to
determine the safety of Bextra® despite overwhelming evidence of the need for
such testing and research; and

d.    The benefits of using Bextra® were outweighed by the risks of a serious
cardiovascular adverse event.

13

62.    The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiffs and for which Pfizer is legally responsible.

## COUNT II – NEGLIGENCE
### (Against Pfizer)

63.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

64.    At all relevant times, Pfizer had a duty to exercise reasonable care to properly prepare, design, research, develop, test, manufacture, inspect, label, market, promote, and sell Bextra®, including a duty to insure that users did not suffer from unreasonable, dangerous or untoward adverse side effects.

65.    At all relevant times, Pfizer owed a duty to properly warn consumers and their physicians of the risks, dangers, and adverse side effects of Bextra®.

66.    Pfizer failed to exercise ordinary care in the preparation, design, research, development, testing, manufacturing, inspection, labeling, marketing, promotion, and selling of Bextra®.

67.    Pfizer knew, or in the exercise of reasonable care, should have known, that Bextra® was likely to cause injury to a significant number of those taking the drug if Pfizer failed to exercise ordinary care.

68.    Pfizer was negligent in the preparation, design, research, development, testing, manufacturing, inspection, labeling, marketing, promotion, and selling of Bextra® in that it:

    a.    Developed a drug with known potential to increase cardiovascular risk, which risks were not outweighed by any potential benefit;

14

b.    Failed to adequately test pre-market to determine actual potential extent of adverse cardiovascular events;

c.    Failed to accurately and completely report known risks of Bextra® to the FDA;

d.    Failed to fully and completely inform prescribers and the public about known risks of Bextra®;

e.    Overstated the benefits of Bextra® relative to other safer drugs, to the FDA, prescribers, and consumers.

f.    Despite direct knowledge that they were indicated and required, Pfizer refused to conduct any studies designed to determine the extent of the actual potential of adverse cardiovascular events.

g.    Made no meaningful effort to report actual adverse events to the FDA, or to inform prescribers and consumers of the same;

h.    Minimized, attempted to conceal and actively concealed information as it became available about the adverse cardiovascular events attributable to Bextra®; and

i.    Was otherwise careless and negligent.

69.    Despite the fact that Pfizer knew or should have known that Bextra® caused unreasonable and dangerous side effects which many users would be unable to remedy by any means, Pfizer continued to promote and market said drug to consumers, including Charles Brady, when safer and more effective treatments were available.

70.    Pfizer knew or should have known that consumers such as Charles Brady would foreseeably suffer injury as a result of Pfizer's failure to exercise ordinary care as described herein.

71.    The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiffs and for which Pfizer is legally responsible.

15

## COUNT III – FAILURE TO WARN
### (Against Pfizer)
#### Restatement of Torts (Second) § 388
#### or
#### Restatement of Torts (Third): Prod. Liab. §6

72.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

73.     Pfizer had a continuing duty to warn the prescribing physicians and users of Bextra® of the risks and benefits associated with said drug.

74.     Bextra® was defective and unreasonably dangerous when it left the possession of Pfizer because:

    a.     The labeling was misleading regarding the purported risks and benefits associated with said drug; and,

    b.     Their labeling was inadequate to alert physicians and consumers, such as Charles Brady, to the dangerous risks and adverse cardiovascular events associated with said drug.

75.     Pfizer, as a manufacturer of pharmaceutical medications, is held to the level of knowledge of an expert in the field.

76.     The warnings that were given by Pfizer to the prescribing physicians and users of Bextra® were defective in that they misrepresented what Pfizer knew, or should have known, and were not adequate, accurate, clear, or complete.

77.     Pfizer had a continuing duty to warn the prescribing physicians and users of Bextra® of the dangers associated with said drug, and breached that duty.

78.     The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiffs and for which Pfizer is legally responsible.

## COUNT IV – FRAUD AND FALSE ADVERTISING
### (Against Pfizer)

79. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

80. Pfizer owed a duty to provide complete and accurate information regarding Bextra® to Charles Brady, physicians, and anyone else it knew or should have known would ingest, prescribe or recommend the ingestion of said drug.

81. Pfizer misrepresented material facts regarding the safety and efficacy of Bextra® and failed to inform and did conceal these material facts from Charles Brady, physicians and the general public.

82. Pfizer fraudulently, intentionally and/or with gross negligence and recklessness misrepresented to Charles Brady, physicians, and the general public that Bextra® was safe and effective, that the benefits of taking said drug outweighed any risks, and/or fraudulently, intentionally and/or in a grossly negligent and reckless manner misrepresented and concealed safety and effectiveness information regarding said drug, including but not limited to the propensity of said drug to cause serious physical harm.

83. The continuous and ongoing course of action constituting fraud and misrepresentation on Charles Brady, physicians, and the general public started as early as 1999, if not earlier, and continued through repeated acts and non-disclosure every year since then, throughout the United States and elsewhere.

84. Bextra® was in fact unsafe and its use posed a risk of injury and death which outweighed the purported benefits of such use, thereby causing injury to Charles Brady and others.

85. Pfizer made misrepresentations and actively concealed adverse information at a time when Pfizer knew, or should have known, that Bextra® had defects, dangers, and

17

characteristics that were other than what Pfizer had represented to the prescribing doctors or other dispensing entities, the FDA, and the consuming public, including Charles Brady.

86.   Specific misrepresentations and/or active concealment by Pfizer include, but are not limited to, the following:

    a.    Failure to disclose that there had been insufficient studies regarding the safety and efficacy of Bextra®;

    b.    Marketing, promoting and/or selling Bextra® as if it were fully and adequately tested, when it was not;

    c.    Misrepresenting the safety and efficacy of Bextra® in the labeling, advertising, product inserts, promotional materials, and/or other marketing and/or safety surveillance efforts;

    d.    Misrepresenting the existence and adequacy of testing of Bextra® both pre-and post-marketing; and

    e.    Concealing or failing to disclose the severity and frequency of adverse health effects caused by Bextra®.

87.   The misrepresentations and/or active concealment alleged above were perpetuated directly and/or indirectly by Pfizer, and those acting on its behalf.

88.   The fraudulent misrepresentations of Pfizer took the form of, among other things, express and implied statements, publicly disseminated misinformation, misinformation provided to regulatory agencies, inadequate, incomplete and misleading warnings about Bextra®, failure to disclose important safety and injury information regarding said drug, and elaborate marketing, promotional, and advertising activities designed to conceal and mislead regarding the safety of said drug, all while having a duty to disclose such information to Charles Brady and others.

89.   Pfizer knew or should have known that these representations were false and material at
      the time they were made or omitted or concealed, and made the representations with the
      intent or purpose that patients, including Charles Brady, and their physicians would rely
      on them, leading to the use of Bextra® by such patients, including Charles Brady.

90.   Charles Brady had no knowledge of the information concealed and/or suppressed by
      Pfizer.

91.   Charles Brady was misled and/or relied on and/or was induced by the misrepresentations
      and/or active concealment by Pfizer, and was misled and relied on the absence of safety
      information which Pfizer did suppress, conceal or fail to disclose thereby causing injury
      and damage to Charles Brady.

92.   Pfizer made the misrepresentations and/or actively concealed information with the
      intention and specific desire that Charles Brady and the general public would rely on such
      misrepresentations or on the absence of information concealed by Pfizer in selecting and
      using Bextra®.

93.   Pfizer undertook marketing strategies which included advertising campaigns to
      aggressively promote and sell Bextra® by misleading and failing to warn potential users
      about the serious health effects that Pfizer knew, or should have known, could result from
      the use of said drug.

94.   This advertising campaign on the whole, through its affirmative misrepresentations and
      omissions, falsely and fraudulently created the impression that the use of Bextra® was
      safe and had fewer adverse health and side effects than were actually known to Pfizer at
      the time it made these representations.

19

95.    The misrepresentations and/or active concealment by Pfizer constitute a continuing tort in violation of both common law and KRS 217.175(5).

96.    The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiffs and for which Pfizer is legally responsible.

### COUNT V - MISREPRESENTATION BY SELLER OF CHATTEL
### (Against Pfizer)
### Restatement of Torts (Second) § 402B
### or
### Restatement of Torts (Third): Prod. Liab. § 9

97.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

98.    At all relevant times herein, Pfizer was in the business of selling prescription drugs, including Bextra®.

99.    Through its actions and omissions in advertising, labeling, promotional literature, moving pictures, product brochures, and otherwise, Pfizer made public misrepresentations of material fact concerning the character, safety, and effectiveness of Bextra® to both the general public and treating and prescribing physicians.

100.    These public misrepresentations and representations include, but are not limited to those set forth in other Counts of this Complaint.

101.    The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiffs and for which Pfizer is legally responsible.

### COUNT VI - BREACH OF EXPRESS AND IMPLIED WARRANTY
### (Against Pfizer)

102.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

20

103. Pfizer, through description, affirmation of fact, and promises relating to Bextra®, and made to the FDA, to prescribing physicians, and to the general public, including Charles Brady, expressly warranted that Bextra® was both effective and safe for its intended use.

104. These warranties came in the form of: (i) publicly-made written and verbal assurances of the safety and efficacy of Bextra® by Pfizer; (ii) press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create and increase demand for Bextra®, and which failed utterly to warn of the risks inherent to the ingestion and use of said drug; (iii) verbal assurances made by Pfizer, or its agents, regarding Bextra®, and the downplaying of any risk associated with said drug; (iv) false and misleading written information, supplied by Pfizer, and published in the *Physicians Desk Reference* on an annual basis, upon which physicians relied in prescribing Bextra® during the period of Charles Brady's ingestion of said drug; (v) promotional pamphlets and brochures published and distributed by Pfizer, and directed to consumers; and (vi) advertisements. The documents referred to in this paragraph were created by and at the direction of Pfizer, and, therefore, are in its possession and control.

105. Pfizer also impliedly warranted that Bextra® was of merchantable quality and was fit for its intended use and particular purpose.

106. At the time of these express and implied warranties, Pfizer had knowledge of the purpose for which Bextra® was to be used and warranted said drug to be in all aspects safe, effective, and proper for such purpose.

107. Bextra® did not conform to these express and implied warranties in that it is neither safe nor effective and its use produces serious adverse side effects, and as such, Bextra® was not in conformity with the promises, descriptions or affirmations of fact made about said

21

drug nor was it adequately contained, packaged, labeled or fit for the ordinary purposes for which such goods are used.

108.    Pfizer further breached express and implied warranties to Charles Brady by: (i) manufacturing, marketing, packaging, labeling, and selling Bextra® in a way that misstated the risks of injury, without warning or disclosure thereof by package and label of such risks to Charles Brady or prescribing physicians or pharmacists, and without modifying or excluding such express and implied warranties; and (ii) manufacturing, marketing, packaging, labeling, and selling Bextra® to Charles Brady which caused serious physical injury and pain and suffering.

109.    The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiffs and for which Pfizer is legally responsible.

## COUNT VII – CONSUMER PROTECTION ACT
### (Against Pfizer)

110.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

111.    Pfizer misrepresented the efficacy and safety of Bextra® to Plaintiffs through its advertising, promotion and sales efforts, as directed to Plaintiffs, the local community, prescribing physicians and the FDA.

112.    Pfizer's actions and failures to act as alleged in this Complaint constitute unfair, false, misleading and deceptive acts and practices in the conduct of trade and commerce in violation of the Kentucky Consumer Protection Act, KRS 367.170.

113.    As a result of Pfizer's deceptive and unconscionable conduct, Charles Brady was prescribed Bextra®, Charles Brady purchased Bextra® and Charles Brady did in fact

22

consume Bextra®. Charles Brady's use of Bextra® was entirely for Charles Brady's personal purposes.

114.    Charles Brady is within the class of people intended to be protected by the Kentucky Consumer Protection Act.

115.    The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiffs and for which Pfizer is legally responsible.

116.    In addition, the Court should award Plaintiffs reasonable attorneys' fees and costs as allowed by the Kentucky Consumer Protection Act, KRS 367.220(3).

## COUNT VIII – JOHN DOES
### (Claims against the John Doe Sales Representative Defendants)

117.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

118.    At all times material hereto, the Defendants, John Doe One and John Doe Two (hereinafter called the "Sales Representative Defendants") as employees of Pfizer were in the business of marketing and promoting the pharmaceutical drug Bextra® within the Commonwealth of Kentucky.

119.    As set forth more completely herein, the Sales Representative Defendants owed various duties to Charles Brady, but breached those duties by committing positive tortious actions including but not limited to their interactions and misrepresentations to Charles Brady's prescribing health care provider(s) regarding Bextra®.

120.    The Sales Representative Defendants owed a duty to provide complete and accurate information regarding Bextra® to Charles Brady, Charles Brady's health care

23

provider(s), and anyone else they knew or should have known would ingest, prescribe or recommend the ingestion of Bextra®.

121.    The Sales Representative Defendants misrepresented material facts regarding the safety and efficacy of Bextra®, and failed to inform and did conceal from Charles Brady, the public and health care providers these material facts.   The Sales Representative Defendants also supplied Charles Brady and Charles Brady's health care provider(s) with labeling information supplied by the manufacturer when they knew or should have known that the labeling information that was supplied with Bextra® was inaccurate, misleading and incomplete.

122.    The Sales Representative Defendants fraudulently, intentionally and/or with gross negligence and recklessness misrepresented to Charles Brady, Charles Brady's health care provider(s), and the general public that Bextra® was safe and effective, that the benefits of taking the drug outweighed any risks, and/or fraudulently, intentionally and/or in a grossly negligent and reckless manner misrepresented and concealed safety and effectiveness information regarding Bextra®, including but not limited to the propensity of Bextra® to cause serious physical harm.

123.    Bextra® was in fact unsafe and the use of it posed a risk of injury and death which outweighed the purported benefits from its use, such that injury was in fact caused to Charles Brady and others.

124.    The Sales Representative Defendants made misrepresentations and actively concealed adverse information at a time when they knew, or should have known, that Bextra® had defects, dangers, and characteristics that were other than what had been represented to the

prescribing health care provider(s) or other dispensing entities, the FDA, and the consuming public, including Charles Brady.

125.    The Sales Representative Defendants knew, or should have known, or consciously or recklessly chose not to know, that these representations were false and material at the time they were made or omitted or concealed, and made the representations with the intent or purpose that Charles Brady and Charles Brady's health care provider(s) would rely on them, leading to the use of Bextra® by Charles Brady.

126.    The Sales Representative Defendants made the misrepresentations and/or actively concealed this information with the intention and specific desire that Charles Brady and Charles Brady's health care provider(s) or other dispensing entities and the consuming public would rely on such or the absence of information in selecting Bextra® as a treatment for Charles Brady.

127.    Charles Brady and Charles Brady's health care provider(s) relied on and/or were induced by the misrepresentations and/or active concealment and on the absence of safety information which the Sales Representative Defendants did suppress, conceal or fail to disclose.

128.    The misrepresentations of and/or active concealment by the Sales Representative Defendants constitute a continuing tort.

129.    The tortious acts by the Sales Representative Defendants include, but are not limited to, the following:

      a.    The Sales Representative Defendants were in the business of marketing, promoting, selling and/or distributing the unreasonably dangerous drug, Bextra®, which caused harm to Charles Brady;

      b.    The Sales Representative Defendants negligently distributed, marketed, advertised and/or promoted the dangerous drug Bextra®;

25

     c.    The Sales Representative Defendants failed to adequately warn prescribing health care providers of the dangers Bextra® posed and failed to discuss the lack of efficacy of the drug;

     d.    The Sales Representative Defendants made negligent and/or intentional misrepresentations regarding the safety and efficacy of the dangerous drug, Bextra®.

130.    The Sales Representative Defendants were directly involved in selling the defective product Bextra® to Charles Brady in that they each made visits to the office of Charles Brady's prescribing health care provider(s), specifically intending to cause said health care provider(s) to prescribe Bextra®.

131.    The Sales Representative Defendants detailed the health care provider(s) who prescribed Bextra® for Charles Brady, and during such detailing encouraged the use of Bextra® in situations where such use was not indicated, and/or gave the health care provider(s) a copy of an article or articles which reported favorably on the safety of Bextra®.  The Sales Representative Defendants understated or misrepresented associated risks and/or overstated the safety and effectiveness of the drug, and/or provided materially incomplete information in those respects.

132.    The Sales Representative Defendants knew that it was wrongful to understate or withhold information regarding the risks of Bextra® and to overstate its safety and effectiveness, or to make representations to health care providers that were not based on complete information.

133.    The Sales Representative Defendants had knowledge of the circumstances, of their duties, and of the actionable wrongs set out herein – such as the over-promotion of Bextra® and misrepresentations and omissions – but nonetheless participated in and/or contributed to the commission of the wrongdoing.

134.   The Sales Representative Defendants developed a professional relationship with Charles Brady's prescribing health care provider(s).

135.   Part of that relationship involved the Sales Representative Defendants providing information to Charles Brady's prescribing health care provider(s) about Bextra®.

136.   Charles Brady's prescribing health care provider(s) relied upon the information provided by the Sales Representative Defendants.

137.   Having developed this relationship with Charles Brady's prescribing health care provider(s), the Sales Representative Defendants owed a duty to Charles Brady's prescribing health care provider(s) and consequently to the patients of said health care provider(s) to provide adequate warnings about Bextra®.

138.   Further, by this relationship, the Sales Representative Defendants owed a duty to Charles Brady's prescribing health care provider(s) not to exaggerate the efficacy or minimize the risk of Bextra®.

139.   As a direct result of the efforts of the Sales Representative Defendants, Charles Brady's prescribing health care provider(s) prescribed Bextra® to Charles Brady.

140.   The Sales Representative Defendants breached their duty to Charles Brady, as a foreseeable ultimate consumer of the product being sold, in that:

   a.   They knew or should have known of the cardiovascular risks associated with Bextra®, alleged above, but did not adequately inform Charles Brady's prescribing health care provider(s);

   b.   They knew or should have known that Bextra® was not reasonably safe but did not tell Charles Brady's prescribing health care provider(s); and,

   c.   They failed to adequately stress the limited efficacy of Bextra®, while simultaneously over-stating the safety of the drug and misrepresenting its safety profile.

27

141.   The Sales Representative Defendants breached their duties alleged above and such breach constituted a foreseeable and substantial factor contributing to Charles Brady's damages.

142.   The Sales Representative Defendants made the misrepresentations set forth in this Count either knowing that they were untrue or recklessly without regard for the truth or falsity of such representations.

143.   The misrepresentations of and/or active concealment alleged above were perpetuated directly and/or indirectly by the Sales Representative Defendants, acting in both their individual and corporate capacity.

144.   The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiffs and for which the Sales Representative Defendants are legally responsible.

**COUNT IX - NEGLIGENCE**
**(Against Robert S. Tillett, M.D. and Louisville Neurology Associates, PSC)**

145.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

146.   At all times relevant hereto, Charles Brady had a healthcare provider-patient relationship with Dr. Tillett.

147.   Beginning on or about May 15, 2002 and continuing through approximately March 23, 2005, Dr. Tillett prescribed or otherwise provided Bextra® to Charles Brady.

148.   Despite the fraud of Pfizer and its attempts to conceal and to misrepresent the safety profile of Bextra®, Defendant, Dr. Tillett, nevertheless failed to exercise reasonable care in prescribing Bextra® to Charles Brady, all as more fully set forth in this Count.

28

149. Defendant, Dr. Tillett, in the exercise of reasonable care and in compliance with the relevant standard of care knew or should have known that Bextra® posed real and substantial risks of adverse cardiovascular events, but failed to fully and adequately consider those risks or disclose them to Charles Brady before dispensing or prescribing Bextra®.

150. In dispensing or prescribing Bextra® to Charles Brady, Dr. Tillett was negligent and deviated from the relevant standard of care in several particulars, including, but not limited to: failing to be aware of or consider the real and substantial risks that Bextra® posed of adverse cardiovascular events; failing to determine whether treatment with a COX-2 selective inhibitor was appropriate or indicated because of gastrointestinal or other risks to Charles Brady; failing to obtain informed consent, including the failure to inform Charles Brady of adverse events associated with Bextra® and failing to provide adequate and complete instructions for safe use of the drug.

151. At all times relevant hereto, Dr. Tillett was an employee or agent of LNA, PSC and was acting within the course and scope of that employment or agency.

152. Defendant, LNA, PSC, is legally responsible and liable for the acts or omissions of its employees, agents and servants, including Dr. Tillett, and for any damages resulting therefrom.

153. The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Charles Brady and Tammy Shea Brady and for which Dr. Tillett and LNA, PSC are legally responsible.

29

## COUNT X – DAMAGES, WRONGFUL DEATH AND SURVIVAL
### (Against All Defendants)

154. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

155. As a result of the actions and failures to act of defendants, as set forth in this Complaint, Charles Brady has sustained pain and suffering, physical, emotional and mental, including the loss of enjoyment of life.

156. As a result of the actions and failures to act of defendants, as set forth in this Complaint, Charles Brady and Charles Brady's Estate have incurred medical and other expenses for Charles Brady's care, rehabilitation and treatment, including the expense of hospitalization, nursing care and other treatments.

157. As a result of the actions and failures to act of defendants, as set forth in this Complaint, Charles Brady has suffered loss of earnings and permanent impairment of the power to labor and earn money.

158. As a result of the actions and failures to act of defendants, as set forth in this Complaint, Charles Brady was caused to sustain severe injuries resulting in his death.

159. As a result of the actions and failures to act of defendants, as set forth in this Complaint, Charles Brady's Estate has been damaged by reason of the destruction of Charles Brady's power to labor and earn money and has incurred funeral and other expenses.

160. Defendants are jointly and severally liable for the compensatory damages of Plaintiffs as set forth herein.

### COUNT XI – LOSS OF PARENTAL CONSORTIUM
### (Against All Defendants)

161.    Charles Brady was survived by his minor children,                    , :

        :, and                    :, who have, as a result of the actions and failures to act

        of Defendants, as set forth in this Complaint, suffered substantial losses including, but not

        limited to, the loss of support, society, love, affection, care, attention, companionship,

        comfort, guidance, and protection of Charles Brady.

162.    Defendants are jointly and severally liable for the compensatory damages of Eric Thomas

        Brady, Sarah Shea Brady, and Hannah Marie Brady as set forth herein.

### COUNT XII- PUNITIVE DAMAGES
### (Against Pfizer)

163.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set

        forth herein at length.

164.    Plaintiffs are entitled to punitive damages because Pfizer's actions and failure to act as set

        forth herein were reckless and without regard for the public's safety and welfare. Pfizer

        misled both the medical community and the public at large, including Plaintiffs, by

        making false representations about the safety of Bextra®. Pfizer downplayed, understated

        and disregarded its knowledge of the serious adverse events and side effects associated

        with the use of Bextra®, despite available information demonstrating that Bextra® was

        likely to cause serious and sometimes fatal side effects to users.

165.    Pfizer was or should have been in possession of evidence demonstrating that Bextra®

        caused serious adverse events and side effects.  Pfizer failed to conduct appropriate and

        necessary testing, despite repeated indications and calls therefore, and continued to

31



REDACTED

market Bextra® by providing false and misleading information with regard to the safety and efficacy of said drug.

166. Pfizer acted willfully, wantonly, intentionally, outrageously, maliciously and with reckless and conscious disregard for the health, welfare, safety and rights of Plaintiffs and the general public.

167. Pfizer is liable to Plaintiffs for punitive damages in an amount as supported by the evidence and the law of the Commonwealth of Kentucky.

## COUNT XIII - LOSS OF CONSORTIUM
### (Against All Defendants)

168. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

169. Tammy Shea Brady was at all times relevant hereto the spouse of Charles Brady, and as such, lived and cohabited with Charles Brady.

170. As a result of the actions and failures to act of Defendants as set forth in this Complaint, Tammy Shea Brady has incurred medical and other expenses.

171. As a result of the actions and failures to act of Defendants as set forth in this Complaint, Tammy Shea Brady has suffered the loss of Charles Brady's affection, companionship, services and society, and the marital association between husband and wife has been impaired and depreciated, as a result of which Tammy Shea Brady has been caused great suffering, loss and mental anguish.

172. Defendants are jointly and severally liable for the compensatory damages of Tammy Shea Brady as set forth herein.

32

## PRAYER FOR RELIEF

**WHEREFORE,** Tammy Shea Brady, as Personal Representative of the Estate of Charles Brady and Tammy Shea Brady, Individually, request that this Court enter judgment against Defendants, and award relief as follows:

A.      Compensatory damages against Pfizer & Co., Inc., John Doe One, John Doe Two, Robert S. Tillett, Jr., M.D., and Louisville Neurology Associates, PSC, jointly and severally, in an amount supported by the evidence at trial;

B.      An award of attorneys' fees, pre-judgment and post-judgment interest, and costs of suit, as provided by law against Pfizer & Co., Inc., John Doe One, John Doe Two, Robert S. Tillett, Jr., M.D., and Louisville Neurology Associates, PSC, jointly and severally;

C.      Punitive damages against Pfizer & Co., Inc., in an amount to be determined at trial;

D.      Trial by jury on all issues so triable; and,

E.      Such other legal and equitable relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

By: _____

Jeffrey K. Branstetter
Manton & Branstetter, LLC
705 Meigs Avenue
Jeffersonville, IN 47130
*Counsel for Plaintiffs*

33

## CERTIFICATE OF SERVICE

The undersigned counsel for plaintiffs hereby certifies that a true and accurate copy of this Complaint was served via first-class mail, U.S. postage prepaid, this the _20th_ day of _March_ , 2007, to:

Office of Attorney General Greg Stumbo
State Capitol, Suite 118
Frankfort, KY 40601

_Counsel for Plaintiffs_

34

AOC-056-11
Rev. 2-00

Commonwealth of Kentucky
Court of Justice



CERTIFICATE OF QUALIFICATION

07 P 000973  Case No.

County _____ Jefferson

Court District _____

IN Re: Estate of _____

Proper petition having been filed and the Court having appointed Tammy Shea Brady

as Guardian

of the above estate on the _____ day of MAR 15 2007 _____ , and the fiduciary having

filed in Court bond in the sum of $ _____ the amount fixed, with _____

_____ as surety, which was

approved by the Court, said fiduciary was thereupon duly sworn as required by law and thus qualified on the above date.

The above Order and Qualification is in full force and effect this _____ MAR 15 2007

Attest:    DAVID L. NICHOLSON    _____ Clerk

A COPY
ATTEST: DAVID L. NICHOLSON, CLERK
JEFFERSON CIRCUIT COURT
LOUISVILLE, KENTUCKY
By: _____ Deputy Clerk _____ D.C.

**REDACTED**

AOC-654  Doc. Code: OAG & OCON
Rev. 8-02
Page 1 of 1

Commonwealth of Kentucky
Court of Justice    www.kycourts.net
KRS 387.070, 387.100, 387.175



**ORDER OF APPOINTMENT OF
GUARDIAN / CONSERVATOR FOR MINOR**

Case No. _07–P–000974_

Court    District Probate

County    _JEFFERSON_

IN RE: Estate of _____    _____, a Minor under the age of 18.

The Court directs this Order to:

Name:        TAMMY SHEA BRADY

Address:     288 SPRING LAKE COURT

             LOU, KY    40229

You are hereby appointed [✓] Guardian, [ ] Limited Guardian, [ ] Conservator of the above-named Minor.

If appointed Guardian or Conservator, your bond is fixed at $ _____ ~~$~~ w/s   . Bond must be posted with the circuit court clerk before your appointment becomes effective.

You shall perform all ORDERS and DECREES of this Court required of you, including _____
_____

If appointed Guardian or Conservator, you shall file with the Court:

1. An Inventory of the Minor's real estate, personal property and other financial resources. This Inventory must be filed within sixty (60) days of appointment. (You may use AOC Form 855).

2. A Supplemental Inventory if other property comes to your knowledge. This Supplemental Inventory must be filed within sixty (60) days of the time of obtaining such knowledge. (You may use AOC Form 855).

3. A Periodic Settlement to be filed one (1) year after appointment, and every year thereafter, unless the Minor's net estate is $5,000 or less in which case the report shall be filed every two (2) years after the original report. (You may use AOC Form 856).

4. A Final Settlement upon termination of appointment. (You may use AOC Form -856).

ENTERED IN COURT
DAVID L. NICHOLSON, CLERK

MAR 15 2007

Date: _____    MAR 15 2007    _____ Judge

BY _____
DEPUTY CLERK

**REDACTED**

| AOC-056-11 Rev. 2-00 | **07 2 0 0 0 9 7 4** | Case No. |
|---|---|---|
| Commonwealth of Kentucky Court of Justice | **CERTIFICATE OF QUALIFICATION** | County _____ Jefferson _____ <br> Court District _____ |

IN Re: Estate of ___

Proper petition having been filed and the Court having appointed _Tammy Shea Brady_

as _Guardian_

of the above estate on the _____ day of _____ **MAR 15 2007** _____ and the fiduciary having

filed in Court bond in the sum of $ _____ the amount fixed, with _____ as surety, which was

approved by the Court, said fiduciary was thereupon duly sworn as required by law and thus qualified on the above date.

The above Order and Qualification is in full force and effect this _____ **MAR 15 2007** _____

Attest: ___DAVID L. NICHOLSON___ Clerk

By: _____

A COPY
ATTEST DAVID L. NICHOLSON, CLERK
JEFFERSON CIRCUIT COURT
LOUISVILLE, KENTUCKY
Deputy Clerk

BY: _____ D.C.

**REDACTED**

AOC-854  Doc. Code: OAG & OCON
Rev. 8-02
Page 1 of 1

Commonwealth of Kentucky
Court of Justice    www.kycourts.net
KRS 387.070, 387.100, 387.175



ORDER OF APPOINTMENT OF
GUARDIAN / CONSERVATOR FOR MINOR

Case No.  07–P–000975

Court        District Probate

County    JEFFERSON

IN RE: Estate of _____          _____, a Minor under the age of 18.

The Court directs this Order to:
Name:                          TAMMY SHEA BRADY
Address:                       288 SPRING LAKE COURT
                               LOU, KY   40229

You are hereby appointed  [ ✓ ] Guardian,  [  ] Limited Guardian,  [  ] Conservator of the above-named Minor.

If appointed Guardian or Conservator, your bond is fixed at $____0008_____.  Bond must be posted with the circuit court clerk before your appointment becomes effective.

You shall perform all ORDERS and DECREES of this Court required of you, including _____
_____
_____

If appointed Guardian or Conservator, you shall file with the Court:

1. An Inventory of the Minor's real estate, personal property and other financial resources.  This Inventory must be filed within sixty (60) days of appointment.  (You may use AOC Form 855).

2. A Supplemental Inventory if other property comes to your knowledge.  This Supplemental Inventory must be filed within sixty (60) days of the time of obtaining such knowledge.  (You may use AOC Form 855).

3. A Periodic Settlement to be filed one (1) year after appointment, and every year thereafter, unless the Minor's net estate is $5,000 or less in which case the report shall be filed every two (2) years after the original report.  (You may use AOC Form 856).

4. A Final Settlement upon termination of appointment.  (You may use AOC Form 856).

Date: MAR 15 2007 _____                                             _____ Judge

ENTERED IN COURT
DAVID L. NICHOLSON, CLERK
MAR 15 2007
BY _____
DEPUTY CLERK

REDACTED

AOC-056-11
Rev. 2-00

Commonwealth of Kentucky
Court of Justice



**CERTIFICATE OF QUALIFICATION**

Case No. **07 P 000975**

County _____ Jefferson _____

Court District _____

IN Re: Estate of __

Proper petition having been filed and the Court having appointed _Tammy Shea Brady_
as _Guardian_

of the above estate on the _____ day of _____ **MAR 15 2007** _____, and the fiduciary having
filed in Court bond in the sum of $ _____, the amount fixed, with _____
_____ as surety, which was
approved by the Court, said fiduciary was thereupon duly sworn as required by law and thus qualified on the above
date.

The above Order and Qualification is in full force and effect this **MAR 15 2007** _____

DAVID L. NICHOLSON

Attest: _____ Clerk

By _____

A COPY
ATTEST: DAVID L. NICHOLSON, CLERK
JEFFERSON CIRCUIT COURT
LOUISVILLE, KENTUCKY
_____ Deputy Clerk

By _____ D.C.

REDACTED

AOC-854 Doc. Code: OAG & OCON
Rev. 6-02
Page 1 of 1

Commonwealth of Kentucky
Court of Justice     www.kycourts.net
KRS 387.070, 387.100, 387.176



ORDER OF APPOINTMENT OF
GUARDIAN / CONSERVATOR FOR MINOR

Case No. 07P00373

Court          District Probate

County_____

IN RE: Estate of _____                                    _____, a Minor under the age of 18.

The Court directs this Order to:

Name:     TAMMY SHEA BRADY

Address:     288 SPRING LAKE COURT

LOUISVILLE, KY 40229

You are hereby appointed  [✓] Guardian.  [ ] Limited Guardian,.  [ ] Conservator of the above-named Minor.

If appointed Guardian or Conservator, your bond is fixed at $ _____.  Bond must be posted with the circuit court clerk before your appointment becomes effective.

You shall perform all ORDERS and DECREES of this Court required of you, including _____

_____

If appointed Guardian or Conservator, you shall file with the Court:

1. An Inventory of the Minor's real estate, personal property and other financial resources. This Inventory must be filed within sixty (60) days of appointment. (You may use AOC Form 855).

2. A Supplemental Inventory if other property comes to your knowledge. This Supplemental Inventory must be filed within sixty (60) days of the time of obtaining such knowledge. (You may use AOC Form 855).

3. A Periodic Settlement to be filed one (1) year after appointment, and every year thereafter, unless the Minor's net estate is $5,000 or less in which case the report shall be filed every two (2) years after the original report. (You may use AOC Form 856).

4. A Final Settlement upon termination of appointment. (You may use AOC Form -856).

Date: ____MAR 15 2007____, 2__

ENTERED IN COURT
DAVID L. NICHOLSON, CLERK
MAR 15 2007
BY____DEPUTY CLERK

_____ Judge

REDACTED

AOC-056-11
Rev. 2-00

Commonwealth of Kentucky
Court of Justice

CERTIFICATE OF QUALIFICATION

06P 04896

Case No.

County_____Jefferson_____

Court District____Probate____

IN Re: Estate of_____Charles Thomas Bradey_____

Proper petition having been filed and the Court having appointed__Tammy Shea Bradey_____

as__Administrator_____

of the above estate on the_____day of_____JAN 29 2007_____and the fiduciary having

filed in Court bond in the sum of $___5000_____, the amount fixed, with__CIS_____

approved by the Court, said fiduciary was thereupon duly sworn as required by law and thus qualified on the above____as surety, which was date.

JAN 29 2007

The above Order and Qualification is in full force and effect this_____JAN 29 2007_____

DAVID L. NICHOLSON

Attest:_____Clerk    By_____

Deputy Clerk